In re JACK GREENBERG, INC., Debtor.

Bankruptcy No. 95–13891DWS.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 14, 1995.

Gary M. Schildhorn, Chapter 7 Trustee, Adelman, Lavine, Gold & Levin, Philadelphia, PA.

Joseph Minni, U.S. Trustee, Philadelphia, PA.

## *OPINION*

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Motion of the United States Trustee (the "UST") for Hearing to Determine Trustee Conflict of Interest (the "Motion"). The Motion seeks to disqualify Larry Waslow ("Waslow"), the permanent trustee elected by creditors pursuant to 11 U.S.C. § 702. The record of this Motion consists of the parties' Stipulation of Facts (the "Stipulation") and the testimony and documents presented at the hearing on the Motion. The Motion presents the issue of whether Congress' failure to expressly include in § 702 a requirement that the person elected trustee in a Chapter 7 case be disinterested disables the UST[1] from seeking, and this Court from ordering, removal of the trustee pursuant to § 324 where a conflict of interest exists. Waslow's contention is that the creditors' election of him, with knowledge of his other business activities, insulates his position. We respectfully disagree. However, based on the facts of this case, we think disqualification is not required.

---

1. In response to the Motion and at the hearing, Waslow contended that the UST had no standing to raise the conflict of interest issue. Waslow contends that only creditors would have standing on this issue. Since Congress explicitly provided that the United States Trustee may raise and appear and be heard on any issue or proceeding under the Bankruptcy Code, 11 U.S.C. § 307, we disagreed and allowed the UST to proceed. *See also In re Nanvarok Seven, Inc.,* 148 B.R. 86, 87 (Bankr.D.C.1992) (debtor is an interested party with standing to raise objections to election of chapter 7 trustee); *In re Metro Shippers, Inc.,* 63 B.R. 593, 599 (Bankr.E.D.Pa.1986) (interim trustee has standing to challenge election of permanent trustee).

## BACKGROUND

The bankruptcy proceedings of Jack Greenberg, Inc. ("Debtor") were commenced on May 9, 1995 by the filing of an involuntary petition against it under Chapter 7 of the Bankruptcy Code. On June 19, 1995, the Debtor consented to relief and the case was converted to one under Chapter 11. Stipulation ¶ 1. On July 25, 1995, the Debtor returned to Chapter 7 when the Court granted the UST's Motion to convert the Chapter 11 case.

The UST thereafter appointed Arthur Liebersohn, Esquire to serve as interim trustee pursuant to 11 U.S.C. § 701. *Id.* at ¶ 2. However, at the § 341 meeting on August 28, 1995, creditors holding claims in the total amount of $1,700,695.25 requested an election for a permanent trustee pursuant to § 702.[2] The only nominated candidate was Waslow, Vice President of Purveyors Credit Association t/a/ PMS ("PMS"), who was unanimously elected by the creditors. *Id.* at ¶¶ 3–4. An analysis of the Election Report Summary, Exhibit A to Stipulation, reveals that of the 28 creditors voting, all but C.W. Dunnett, the Teamsters Health & Welfare Fund and the Teamsters Pension Trust Fund did so by proxy statement. Furthermore, 21 of the proxies were solicited by Waslow, on behalf of PMS, pursuant to Fed.R.Bankr.P. 2006(c)(1)(D) which allows a bona fide credit association to solicit creditors who are its members in good standing and who have allowable claims as of the filing of the petition. PMS's statement pursuant to Fed. R.Bankr.P. 2006(e) includes a letter to its members, written by Waslow, requesting their support of his election. By Order dated September 1, 1995, this Court, after considering the Election Report, confirmed Waslow's election as permanent trustee. *Id.* at

¶ 7. Since his election, Waslow has been actively engaged in liquidation of the assets of the Chapter 7 estate.

The UST's objection to Waslow stems from PMS's contemporary services to a company called J & C Provisions, Inc. ("J & C"). PMS, a company that provides credit clearing information and other services to companies engaged in the food service industry, is a party to an agreement with J & C whereby PMS is to collect J & C's accounts receivable and make a pro rata distribution of the net amount of collected accounts to J & C's creditors. *Id.* at ¶¶ 10, 11 and Exhibit B.[3] One such creditor is Debtor. Waslow indicates that the books of both Debtor and J & C reflect J & C's obligation to Debtor at $21,000. The aforementioned agreement runs between J & C and PMS, and the compensation provided therein is to be paid to PMS. However, Waslow is the PMS employee that is collecting the receivables. A distribution had not been made to the Debtor as of the date of the hearing. *Id.* at ¶ 13.

The foregoing relationship was revealed *after* the § 341 meeting. While creditors who cast votes for Waslow were apparently aware of Waslow's relationship to PMS and the nature of the services that organization provides,[4] the specific role that Waslow and PMS were playing with respect to the J & C liquidation and J & C's obligation to Debtor were not disclosed. In particular, the solicitation letter he sent to PMS's members made no mention of J & C. When questioned about the lack of disclosure, Waslow testified that it did not occur to him that PMS's agreement with J & C presented a conflict of interest with his service as trustee in this case. Apparently now recognizing this omission and notwithstanding his view that the creditor support at the hearing[5] demonstrat-

2. The Report of United States Trustee on Trustee Election (the "Election Report") concluded that the amount of claims requesting the election and the amount of claims that cast votes exceeded the 20% threshold requirement of § 702(b). Exhibit A to Stipulation.

3. The agreement and amendments thereto are undated but it is undisputed that PMS was a party to the agreement at the time of Waslow's election.

4. Indeed it does appear that Waslow's experience with PMS in, *inter alia,* liquidating food service receivables was a credential militating in favor of his election.

5. Continued retention of Waslow was advocated by two of Debtor's three secured creditors who hold security interests in Debtor's accounts and shareholder Manny Greenberg. More significantly, the Teamsters Fund Pension Plan which asserts the second largest unsecured claim against Debtor (*see* Exhibit A to Stipulation) and

ed the absence of any need for remedial action, Waslow has offered, if so requested by the Court, to send notice to all creditors of the J & C relationship so as to provide creditors with an opportunity to request a hearing. Trustee's Memorandum at 14 n. 8.

## DISCUSSION

The statutory authority for Waslow's trusteeship is found in section 702 which provides that "[a]t the meeting of creditors held under § 341 of this title, creditors may elect one person to serve as trustee in the case if election of a trustee is requested by creditors...." 11 U.S.C. § 702. In comparison, section 701 which governs the appointment of an interim trustee states that "[p]romptly after the order for relief under this chapter, the United States trustee shall appoint one disinterested person...." 11 U.S.C. § 701. From the plain language of the statute, it appears that Congress required that the appointed interim trustee be disinterested but failed to articulate a similar requirement with respect to the elected Chapter 7 trustee. Because sections 321 and 322, the only other provisions of the Code dealing with who may be eligible or qualified to serve as a permanent Chapter 7 trustee, likewise contain no disinterest requirement,[6] Waslow contends that a trustee's conflict of interest is not a barrier to service as a permanent trustee. The statutory distinction between sections 701 and 702 is, according to Waslow, a reflection of Congress' deliberate intention that unsecured creditors have the unfettered right to the trustee of their own choice.[7] The UST, on the other hand, suggests that

the disinterest requirement may apply to an elected Chapter 7 trustee and that, even if it does not, this Court is not precluded from disqualifying an elected trustee with a conflict of interest.

### A.

■■■ We begin our analysis with the language of the statute recognizing, as did the United States Supreme Court in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), that:

> [t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.'

*Id.* at 241, 109 S.Ct. at 1030 (*quoting Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Where the plain meaning conflicts with another section of the Bankruptcy Code, or with an important state or federal interest, it is appropriate to require some clearer expression of congressional intent. In that situation it is proper to examine pre-Code practice for interpretive assistance. *Id.* at 243, 109 S.Ct. at 1031 (*citing Midlantic Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), and *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)).

---

C.W. Dunnett, the only other unsecured creditor not to vote by proxy solicited by Waslow or Barry Bressler, counsel to the petitioning creditors and now counsel to Waslow, indicated their support for Waslow.

6. One commentator states that although § 321 does not expressly include the requirement that the trustee have no interest adverse to the estate, such requirement is implicit. Bankr. Service L.Ed. § 13.4. Section 321 provides that a person may serve as a trustee only if such person is "an individual that is competent to perform the duties of trustee" and resides in the appropriate district. Competence, which is not statutorily defined, has been construed to mean expertise and experience in the matter for which the person has been appointed or elected. *See e.g., Bergquist v. Felland (In re O–Jay Foods, Inc.)*,

1991 WL 378164 at *13 (D.Minn.1991); *In re Cardinal Industries, Inc.*, 113 B.R. 378, 379 (Bankr.S.D.Ohio 1990). By comparison, under the Bankruptcy Act of 1898, Rule 209(d), which governed eligibility of an elected trustee, imposed a requirement of "no adverse interest" in addition to competency and residency.

Section 322's qualification requirement is the posting of a performance bond.

7. Waslow states as follows:

> The Trustee proposes that unsecured creditors of a Chapter 7 debtor are best equipped to select a trustee who knows the industry and is capable of collecting accounts receivable and maximizing the return to creditors. Therefore, the creditors' unanimous choice should not be disturbed.

Trustee's Memorandum at 10–11.

Here the plain language of § 702 contains no disinterest requirement. According to Waslow, if disinterestedness was a requirement, Congress would have so stated as it did in § 701. However, it does not follow from that omission that a person with an adverse interest to the estate should be able to serve as the elected trustee.

Section 323 provides that the trustee is the representative of the estate. In that capacity the trustee is a fiduciary and intended to be independent. *See In re Manfred,* 153 B.R. 430, 439 (Bankr.D.N.J.1993) (Chapter 7 trustee is a fiduciary of the estate for the benefit of the creditors and other parties in interest); *In re I.D. Craig Service Corporation,* 138 B.R. 490, 501 (Bankr.W.D.Pa. 1992) (trustee in Chapter 7 bankruptcy case is fiduciary and must "adhere to strictest letter of the law in all his dealings with respect to the estate"). *See also Casco Northern Bank, N.A. v. DN Associates d/b/a Atlantic Motor Inn (In re DN Associates d/b/a Atlantic Motor Inn),* 3 F.3d 512, 514 (1st Cir.1993) ("Section 323(a) of the Bankruptcy Code states that a trustee is the fiduciary of the bankrupt estate[.]"). Allowing a person with a conflict of interest to serve as trustee in a case runs counter to this fundamental precept that a trustee is a fiduciary. Thus, Waslow's interpretation of § 702 is at odds with both the Code and an important federal interest.

Under the Bankruptcy Act of 1898, an elected Chapter VII trustee was required to be free of any adverse interest to the estate. *See* Fed.R.Bankr.P. 209(d). A long line of cases enforced that policy. Indeed those cases are still relied upon by a leading commentator in discussing the grounds for disapproving the selection of a trustee elected under § 702. *See* 4 Collier on Bankruptcy ¶ 702.06 at 702–29. According to Collier:

In view of the nature of the duties which devolve upon a trustee in a liquidation case, it is essential that, in addition to being competent, the officer chosen be absolutely impartial. "A trustee should be wholly free from all entangling alliances or associations that might in any way control his complete independence and responsibility." What has been termed "prejudicial associations" with interests adverse to those of the estate which the trustee represents constitutes the most frequent basis for disapproval of the creditors' choice. *Id. (quoting* Note, *Disqualification of Trustees in Bankruptcy for Prejudicial Associations,* 43 Yale L.J. 1187 (1934)). Collier goes on to observe that "the theory of the Code is to give creditors the privilege of electing their own trustee, but (again citing pre-Code cases) "such creditors are 'notoriously inert' and 'not always sufficiently advised to protect their interest.'" *Id.* at ¶ 720.05 at 702–27. The court's power to disapprove the creditors' choice for cause is the safety valve when an inappropriate trustee is elected.

The continued vitality of pre-Code law on this subject was also assumed by the only bankruptcy court to specifically rule on this issue.[8] In *Nanvarok Seven,* Judge Teel, citing the pre-Code case of *In re Mayflower Hat Co.,* 65 F.2d 330, 331 (2d Cir.1933), stated:

As a general rule, the choice of the unsecured creditors should be recognized and upheld by the court unless the selection was contrary to law, *or it appears that the trustee so elected has interests that conflict with those of the general creditors.*

148 B.R. at 87 (emphasis added).

Why the requirement of disinterestedness was carried into the requirements for an appointed Chapter 7 trustee but not into the requirements for an elected Chapter 7 trustee is unexplained. The legislative history of

---

8. Without discussing whether a trustee elected under § 702 must be disinterested, the court in *In re Metro Shippers, Inc.,* 63 B.R. 593, 600 (Bankr.E.D.Pa.1986), dismissed as meritless, on the facts presented, a challenge to the election of a trustee who was receiving a pension from the debtor. However, in *In re Colony Press, Inc.,* 83 B.R. 862 (Bankr.D.Mass.1988), the court stated, in dictum:

The section concerning election of a Chapter 7 trustee contains no requirement that he be a disinterested person. *See* Section 702. Apparently, the draftsmen thought that creditors who elect a trustee do not need this protection because of their free decision to vote in the election.
*Id.* at 867 n. 3.

the Code does not note the difference. Thus, there is no evidence that Congress intended to depart from pre-Code practice. Where that practice reflects policy considerations of great longevity and importance, we believe we must find some rational basis for a departure.

Waslow relies on the existence of the creditor franchise as supporting different requirements for a § 701 and § 702 trustee. As to the latter, he believes Congress intended their choice be unassailable because they are best equipped to select a trustee who knows the industry. If that is so, the statutory requirement of competency would likewise have disappeared with the requirement of no adverse interest for elected trustees. More importantly, if creditors are to be given free reign to elect, why did Congress engraft a disinterested standard on elected Chapter 11 trustees. Waslow suggests the answer lies in the differing duties of a Chapter 7 trustee and Chapter 11 trustee. We disagree. Both Chapter 7 and Chapter 11 trustees liquidate estates and operate businesses, albeit the former activity is more prevalent in Chapter 7 and the converse is true in Chapter 11.

▮ In short, we believe that a Chapter 7 trustee, without regard to how he gained his office, cannot serve with a disabling conflict of interest. The absence of the disinterest requirement in § 702 is not inconsistent with this conclusion. As the Third Circuit Court of Appeals observed in *In re BH & P Inc.,* 949 F.2d 1300 (3d Cir.1991):

> Most of the cases which have addressed the removal of a trustee do not rely on section 101(14)(E) or any analysis of the disinterest requirement [9] but approach the issue instead in terms of whether there is a "conflict of interest" which constitutes cause for removal. In most of these cases,

something beyond a finding of lack of disinterest is required.

*Id.* at 1311 (footnote added). Because the analytical underpinnings of *BH & P* are free of the disinterest requirement, we find the approach to trustee disqualification articulated there to be as appropriate in this case as it was there when the trustee was appointed under § 701.

### B.

In *BH & P,* the Third Circuit Court of Appeals, after rejecting the per se rule employed by the bankruptcy and district courts in applying the disinterest requirement, identified the prevailing standard for trustee removal as first articulated in *In re Freeport Italian Bakery, Inc.,* 340 F.2d 50, 54 (2d Cir.1965). This line of cases requires the demonstration of fraud or actual harm to the estate before a trustee may be removed. Finding this "opposite-end-of-the-spectrum" approach a barrier to the court taking "prophylactic action where the likelihood of injury is great but no harm is manifest," the *BH & P* Court adopted a middle ground rule based on the approach taken by the First Circuit Court of Appeals in *In re Martin,* 817 F.2d 175 (1st Cir.1987):

> The naked existence of a potential for conflict of interest does not render the [arrangement] nugatory, but makes it voidable as the facts may warrant. It is for the court to decide whether the [arrangement] carries with it a sufficient threat of material adversity to warrant prophylactic action.... The test must be an objective one. The question is not necessarily whether a conflict exists-although an actual conflict of any degree of seriousness will obviously present a towering obstacle-but whether a potential conflict, or the perception of one renders the [trustee's] interest

---

**9.** The bankruptcy and district courts in *BH & P* focused on the disinterest requirement as construed in extant case law which held that the appearance of interest would be cause for removal. As such, the lower courts found it necessary to automatically disqualify a trustee serving in jointly administered cases where there were interdebtor claims. The Third Circuit Court of Appeals rejected that approach as overbroad stating:

> While we recognize that cases involving multiple debtors served by a single trustee present special concerns requiring the trustee to balance competing interests with vigilance and guard against conflicts, we also recognize the reality that a single trustee is often able to maximize the return to jointly administered estates through increased economy and efficiency.
>
> 949 F.2d at 1310.

materially adverse to the estate of the creditors.

This inquiry is of necessity case-specific. There must be a minimum full and timely disclosure of the details of any given arrangement. Armed with knowledge of all of the relevant facts, the bankruptcy court must determine, case by case, whether [a situation such as the presence of a single trustee in jointly administered cases where there are interdebtor claims] can be tolerated under the particular circumstances. In so doing, the court should consider the full panoply of events and elements.... The nature and extent of the conflict must be assayed, along with the likelihood that a potential conflict might turn into an actual one. An effort should be made to measure the influence the putative conflict may have in subsequent decision making. Perceptions are important; how the matter likely appears to creditors and to other parties in legitimate interest should be taken into account.... What counts is that the matter not be left either to hindsight or the unfettered desires of the [parties involved], but that the bankruptcy judge be given an immediate opportunity to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding to the request....

949 F.2d at 1312–13 (*quoting In re Martin*, 817 F.2d at 181–82 (citations omitted)). Bound by these principles, we turn to the facts of this case to determine whether Waslow has a conflict of interest which would disqualify him from serving as trustee.

According to the UST, Waslow's conflict arises from Waslow's dual duties: (i) to the Debtor's estate to maximize collection of accounts receivable, including one owed from J & C; and (ii) to J & C to provide a pro rata distribution to its creditors. This duality prevents Waslow from pressing, through litigation, for a larger payment for Debtor. The problem, however, is more apparent than real. In the first place, both J & C and Debtor agree on the amount of J & C's obligation to Debtor. A different situation would exist if the amount were disputed. Furthermore, according to PMS's letter to J & C creditors "prospects are good for substantial distribution." Exhibit C to Stipulation. PMS' goal to maximize the value of J & C's assets in an orderly, expeditious and less costly manner for equal distribution to its creditors is, as Waslow contends, consistent with Debtor's interests.[10] Indeed, it appears that it is PMS and Waslow's knowledge of the food industry and that trade's familiarity with them that enhances their ability to manage J & C's out-of-court arrangement without the costs and delay inherent in a bankruptcy proceeding. Litigation by the trustee, on the other hand, to collect a $21,000 receivable could be time consuming and costly. Litigation by an individual creditor was threatened to result in the filing of a bankruptcy petition by J & C. *Id.* More significantly, PMS's letter to Debtor as one of J & C's creditors was sent on July 28, 1995. Waslow's retention as trustee of Debtor's estate occurred on August 28, 1995. There is no evidence that the interim trustee took any action after receiving the July 28 letter [11] and prior to Waslow's retention to

---

**10.** This situation is quite different from *In re Paolino*, 80 B.R. 341 (Bankr.E.D.Pa.1987), where the trustee affiliated with and was represented by a law firm which represented a party being sued by the debtor. Since the suit passed to the estate and was therefore within the trustee's control, the law firm was in effect counsel to both plaintiff and defendant in the same suit. *Id.* at 345. That dual representation disqualified the firm from serving as trustee's counsel and disqualified the trustee because of his affiliation with the firm. *Paolino*, which is commended to us by the UST as controlling our decision here, along with other cases adopting the per se disqualification approach, was distinguished by the subsequent *BH & P* case, as involving personal, not representational interests of the trustee. Where, a

trustee asserts a claim as a fiduciary on behalf of the estate that he serves, as Waslow does on behalf of Debtor against J & C, he acts in a representational capacity. In that case, the proper test involves a balancing of interests.

**11.** Jim Wagner, an employee of first the Debtor, then the interim trustee and now Waslow, testified that he found the letter and turned it over to the interim trustee. The letter was accompanied by a consent form which provided, *inter alia*, that the creditor would not commence litigation so that the value of assets could be maximized and all creditors treated pro rata. There is no evidence that anyone signed the consent on behalf of Debtor.

collect the receivable. Thus, we perceive no harm to Debtor's estate from Waslow's inability to sue J & C to collect the $21,000. This observation is apparently shared by the bank that holds a lien on that asset which has allowed Waslow to continue collection of the accounts receivable that are its collateral.

We also are mindful that the duty to collect the J & C receivable is but a small part of the duties Waslow is performing for the Debtor. The $21,000 receivable is part of a receivables pool with a face value of $1.1 million. According to Jim Wagner, collections of these receivables have improved under Waslow. Negotiations to collect a $235,000 receivable from Quaker Valley apparently took "a 180 degree" turn for the better when Waslow took control.[12] Given the relative significance of this activity to the trustee's overall tasks in this case, we do not find that "the putative conflict will have any influence in the trustee's subsequent decision making." *BH & P*, 949 F.2d at 1312. Given the benefits to creditors as perceived by the Court and as expressed by the creditors that appeared at the hearing to urge retention of Waslow, and having weighed the potential of harm arising from Waslow and PMS's service to J & C, we believe his disqualification is not required.

■ In so stating, we do not conclude that dual representation may not be impermissible on other facts. As the *BH & P* Court concluded, each case involving a single trustee with claims against another "estate" he serves must be evaluated on a case-by-case basis:

> In some circumstances, the potential for conflict *may*, without more, justify removing a trustee from service. At the same time, however, it must be made clear that "horrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending [the trustee] away to lick his wounds."

949 F.2d at 1313 (*quoting In re Martin*, 817 F.2d at 183).

### C.

■ Finally we must address Waslow's failure to disclose his and his firm's arrangement with J & C in connection with his solicitation of votes in favor of his election. Having found that the J & C relationship does not present an actual, material conflict requiring Waslow's disqualification does not negate the possibility that creditors may have voted otherwise if they were apprised of this fact. The thrust of Waslow's position in opposition to the Motion is that the creditors' unanimous choice of him as trustee should be undisturbed. However, the foundation of this argument is undermined by the fact that the creditors were not given all information potentially relevant to their decision. The question is whether the information not supplied is so material as to require the invalidation of the Waslow's election.

■ Waslow's failure to provide information about the J & C relationship is not to be dismissed lightly. While we accept his explanation that he did not consider it to be a conflict, that decision is not his to make. *See In the Matter of REA Holding Corp. et al.*, 2 B.R. 733, 735–36 (S.D.N.Y.1980). Creditors, and of course the Court, must be provided "full and timely disclosure of the details of a given relationship." *See BH & P*, 949 F.2d at 1312 (*quoting Martin*, 817 F.2d at 182). It is implicit that a valid election be the result of votes cast by a fully informed electorate.

Yet under the circumstances, we believe it would be imprudent to invalidate the election as a result of Waslow's failure to disclose what we perceive as a relatively immaterial potential conflict of interest. Indeed the likelihood that creditors with full knowledge of all facts would re-elect Waslow is suggested by the support for him and against the Motion evidenced at the hearing on the Motion.

Disqualification of Waslow at this time would be prejudicial to creditors. Given his current efforts to sell the Debtor's real estate, collect receivables, and pursue litigation, including the marshalling claim against the

---

12. Indeed, we learned at a recent hearing in this case that the matter has been successfully resolved for the estate.

banks, an interruption in service would, at best, slow the liquidation process and at worst, impair its success. In light of the foregoing, ordering a new election with the costs attendant thereto, particularly when the creditors are likely to validate their choice, is unwarranted so long as there is a remedy for the failure to disclose. We believe one has been suggested by Waslow. His offer to give notice to creditors of his J & C relationship and afford them the opportunity to request a hearing on his continued retention is sufficient. As a result of such request, a new election could be ordered. We do not see the need to do so now.